## MICHAEL ARDOLINE, ADMINISTRATOR (ESTATE OF ELLEN ARDOLINE) v. DANIEL F. KEEGAN

INGLIS, C. J., BALDWIN, O'SULLIVAN, QUINLAN and WYNNE, Js.

Argued November 3, 1953—decided January 5, 1954

*Cyril Coleman,* for the appellant (defendant).

*Harry J. Zigun,* with whom, on the brief, was *Samuel Engelman,* for the appellee (plaintiff).

INGLIS, C. J. This is an action for malpractice. The trial court directed a verdict for the defendant on the grounds (1) that there had been no evidence that the defendant's treatment of the plaintiff's decedent was not in accordance with the requisite standard of care, and (2) that there had been no evidence of a causal relationship between the defendant's treatment and the death of the plaintiff's decedent. After verdict the court reversed its position and granted a motion to set the verdict aside. From this action the defendant has appealed.

The defendant offered no evidence, but from that submitted by the plaintiff the jury could reasonably have found the following facts: On January 10, 1951, the plaintiff's decedent consulted the defendant, a physician and surgeon, at his office in Bridgeport, complaining of a headache and that her nose was blocked up. At that time she was forty-six years old, was overweight and at various times during the preceding five or six years had been suffering from hypertension. Upon examining her, the defendant stated that there was a polyp in her nose. He removed the polyp surgically and gave her two prescriptions, one for codeine and the other for a 1 per cent solution of pontocaine, with instructions to use the latter as a nasal spray. During the evening the pontocaine solution was sprayed into her nose on two occasions.

She then became pale and sweaty and her lips began to get blue.

On the following day she continued pale and sweaty and slept a great deal of the time. The spray was used twice. At about 6 o'clock in the evening, after members of her family had attempted unsuccessfully to summon the defendant, they called Dr. Bernstein, the decedent's family physician. He found her in a stuporous condition with a high temperature. He gave her penicillin and suggested to members of her family that they continue their efforts to summon the defendant. The plaintiff's decedent died shortly after 4 o'clock the following morning.

In addition to introducing evidence as to those facts, the plaintiff produced two doctors, Dr. Moses D. Deren and Dr. Sidney D. Jacobson. Dr. Deren testified that after having been admitted to practice in 1933 he practiced in New York but, for the six years prior to the trial, he had practiced in Bridgeport, his specialty being internal medicine. He stated that the standard procedure in Connecticut in regard to the use of pontocaine is to use it in accordance with the directions issued by those who manufacture it. No evidence was offered of what those directions were. The witness did testify, however, that the standard practice in the use of the drug is the same in Connecticut as it is in New York.

So far as Dr. Jacobson's testimony is pertinent to the issues on this appeal, it was as follows: He is a physician of many years' experience in New York City but has never practiced in Connecticut. He is familiar with the drug pontocaine and it is used for "topical application," that is, application to the surface of the body including the mucous membranes. He was asked: "Do you have any other source of in-

formation which would qualify you to testify as to how the drug pontocaine is administered in the State of Connecticut?" He answered: "Yes. My source of information is sufficient to cover that." Then followed this question: "Do you know in what manner the drug pontocaine is administered in the State of Connecticut, Dr. Jacobson?" His reply was: "Yes, it's never administered by spray." This was the only expert testimony in the case bearing on the question whether the defendant had failed, in his treatment of the decedent, to meet the standard of care current in the neighborhood of Bridgeport.

In reviewing a ruling of a trial court upon a motion to set aside a verdict, we are concerned primarily with whether the court has abused its legal discretion. See *Hagstrom* v. *Sargent,* 137 Conn. 556, 561, 79 A.2d 189. In determining this the unquestioned rule is that " 'great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness.' " *Dudas* v. *Ward Baking Co.,* 104 Conn. 516, 518, 133 A. 591; *Roma* v. *Thames River Specialties Co.,* 90 Conn. 18, 20, 96 A. 169. It must always be borne in mind that litigants have a constitutional right to have issues of fact decided by the jury and not by the court. *Schlag* v. *Paffney,* 103 Conn. 683, 685, 131 A. 420; *Robinson* v. *Backes,* 91 Conn. 457, 460, 99 A. 1057. In the present case this consideration tends to support the setting aside of the verdict because the verdict had been reached by the direction of the court and not by the jury passing on the questions of fact. It is proper for a trial court, using due caution, and in the exercise of its discretion, to set aside a verdict when satisfied that its instructions to the jury or its rulings on evidence were erroneous and that those erroneous instructions or rulings were consequential

enough to have had a substantial effect on the verdict. *Munson* v. *Atwood*, 108 Conn. 285, 288, 142 A. 737.

Upon the trial of the present action the plaintiff presented a case in which the proof of malpractice was very tenuous and in which there was no evidence of causation. The trial court, after reviewing the evidence, came to the conclusion that the testimony of Dr. Jacobson, supplemented by that of Dr. Deren, was sufficient to carry the case to the jury. It also concluded that it had improperly excluded proffered evidence of causation and that, therefore, its direction of the verdict was erroneous. The question before us is whether in making that decision it abused its discretion.

To recover in a malpractice action against a physician the plaintiff must prove that the defendant failed to exercise that degree of care, skill or diligence ordinarily had and exercised by physicians engaged in the same line of practice in the general neighborhood where the treatment complained of was administered. *Sheridan* v. *Quarrier,* 127 Conn. 279, 281, 16 A.2d 479; *Force* v. *Gregory,* 63 Conn. 167, 169, 27 A. 1116. Ordinarily this proof must rest upon the testimony of an expert witness who is qualified to express an opinion as to the standard of care customarily exercised by physicians in the general neighborhood with reference to the diagnosis and treatment of the disease with which the plaintiff was afflicted. It is ordinarily requisite that such an expert testify that the defendant's conduct did not measure up to that standard. *Haliburton* v. *General Hospital Society,* 133 Conn. 61, 65, 48 A.2d 261; *Frogge* v. *Shugrue,* 126 Conn. 608, 612, 13 A.2d 503; *Person* v. *Lilliendahl,* 118 Conn. 693, 695, 172 A. 94; *Chubb* v. *Holmes,* 111 Conn. 482, 486, 150 A. 516.

It is only in a case where there is manifest such obvious gross want of care or skill as to afford, of itself, an almost conclusive inference of want of care that the testimony of an expert witness is not necessary. *Slimak* v. *Foster,* 106 Conn. 366, 370, 138 A. 153. Clearly, in the present action such expert testimony was essential to the plaintiff's case.

Inasmuch as it appeared that the defendant had directed that the pontocaine solution be used as a nasal spray, Dr. Jacobson's testimony that in Connecticut pontocaine is never administered by spray was sufficient to meet the requirement of expert evidence if, in fact, he was qualified as an expert to express an opinion on the subject. According to his testimony he was a physician of long experience. Such doubt as there might be concerning his qualification arises in large measure from the fact that he had never practiced in Connecticut. The mere fact that a physician has not practiced in the immediate neighborhood in which the claimed malpractice has occurred does not necessarily disqualify him from testifying as to the standards of practice in that locality. The crucial question is whether he knows what those standards are. *Geraty* v. *Kaufman,* 115 Conn. 563, 572, 162 A. 33; *Lewis* v. *Johnson,* 12 Cal. 2d 558, 561, 86 P.2d 99; *Kirchner* v. *Dorsey & Dorsey,* 226 Iowa 283, 293, 284 N.W. 171; *Tennant* v. *Barton,* 164 Wash. 279, 284, 2 P.2d 735; see 2 Wigmore, Evidence (3d Ed.) § 569. Dr. Deren testified that the practice in administering pontocaine is the same in Connecticut as it is in New York. This was relevant evidence tending to qualify Dr. Jacobson. *Sampson* v. *Veenboer,* 252 Mich. 660, 667, 234 N.W. 170. Dr. Jacobson himself testified that he knew what the practice in Connecticut was. Although it is true, as pointed out by the defendant, that at one stage of the

proceedings counsel for the plaintiff had stated that he was not offering Dr. Jacobson as an expert as to Connecticut practice, this was long before the doctor had testified that he knew what the Connecticut practice was. At the time he testified that pontocaine was never administered as a spray, the defendant made no objection to the admission of the testimony on the ground that the doctor was not qualified.

The defendant makes the further point that the doctor's answer was framed in the present tense. That is, he was testifying as to what the standard of care was at the time of the trial rather than at the time of the treatment. Although this is technically accurate, it is also true that the jury might reasonably have interpreted his statement as referring to the standard in vogue at the time of the decedent's treatment or, if not that, they might reasonably have inferred that the standard was the same at the time of treatment as it was at the time of trial. On the whole we conclude that Dr. Jacobson was qualified to give expert testimony of the degree of care and skill commonly exercised by physicians in the general neighborhood of Bridgeport in the treatment of cases like that of the plaintiff's decedent. When he testified that the defendant's treatment of the decedent did not measure up to that standard, there was enough evidence on the subject to permit the case to go to the jury. The direction of the verdict grounded on lack of evidence of negligence was erroneous.

The second main contention made by the defendant on this appeal is that there was no evidence that any malpractice on the part of the defendant was the cause of the decedent's death. Such evidence was, of course, essential to the plaintiff's case and it, also, would have to be introduced through an expert witness. *Green* v. *Stone,* 119 Conn. 300, 306, 176 A.

123. There is no disputing the fact that such evidence was entirely lacking in the case at bar.

On the trial, however, the plaintiff propounded to Dr. Jacobson a long hypothetical question reciting much of the evidence concerning the defendant's treatment of the decedent, her symptoms following that treatment and the circumstances attending her death. The question ended with this: "Now doctor, assuming these facts to be true, do you have an opinion as to the cause of the patient's death?" Upon objection by the defendant the question was excluded and the plaintiff took an exception. None of the grounds of objection stated by the defendant would have warranted the ruling made by the court. The explanation of the ruling is to be found in the memorandum on the motion to set aside the verdict. It was noted therein that Dr. Jacobson's testimony that defendant's treatment fell short of the proper standard of care had escaped the court's attention. The memorandum continues: "Had the presence of that element been called to the Court's attention, the plaintiff would have been entitled to inquire into the further essential of the cause of death." The ruling excluding the proffered testimony of the expert as to the cause of death was erroneous. *Jackson* v. *Waller*, 126 Conn. 294, 306, 10 A.2d 763.

To summarize, both the direction of the verdict and the ruling excluding evidence of the causal relationship between the defendant's conduct and the decedent's death were erroneous. If the doctor had been allowed to testify, and had testified, that there was a causal relationship between the treatment and the death, and the case had been allowed to go to the jury, a different verdict might have resulted. The action of the trial court in setting the directed verdict aside was within its discretion and proper.

It is unnecessary to pass upon the questions raised by the plaintiff's bill of exceptions.

There is no error.

In this opinion the other judges concurred.